**In re Earle K. WHITLEY, Debtor.**

**Earle K. WHITLEY, Plaintiff,**

v.

**RHODES FINANCIAL SERVICES, INC., Defendant.**

**Bankruptcy No. 93–19652–JNF.
Adv. No. 94–1008.**

United States Bankruptcy Court,
D. Massachusetts,
Bankruptcy Division.

Jan. 24, 1995.

John Roddy of Grant & Roddy, Boston, MA, for debtor.

Kevin J. Simard, Riemer & Braunstein, Boston, MA, for Counsel to Chapter 7 trustee in Rhodes Financial Services, Inc.

Ernest L. Sarason, Jr., Asst. Atty. Gen., Consumer Div., Boston, MA, for Com. of Massachusetts.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

### I. PROCEDURAL BACKGROUND

The matter before the Court is the Motion for Partial Summary Judgment filed by the Plaintiff, Chapter 13 Debtor Earle K. Whitley (the "Plaintiff" or the "Debtor"), in his adversary proceeding against Rhodes Financial Services, Inc. (the "Defendant" or "Rhodes"), which adversary proceeding was filed on January 6, 1994. In addition to seeking damages and a determination that he validly rescinded the mortgage held by Rhodes, the Debtor sought a preliminary injunction against Rhodes to restrain it from refusing to honor his valid rescission. After notice and a hearing, this Court entered an order dated January 14, 1994, granting the Debtor's request for a preliminary injunction, ordering Rhodes to deliver a discharge of the mortgage it held on the Debtor's home, and requiring counsel to the Debtor and the De-

fendant to hold the sum of $35,000.00 in a joint escrow account pending a decision on the merits of the adversary complaint.

In response to the Court's order, Rhodes filed a notice of appeal, a motion for leave to appeal and a motion for a stay pending appeal. Prior to a hearing on the motion for a stay pending appeal, the parties, on February 18, 1994, filed a stipulation in which Rhodes agreed to discharge its mortgage on the Debtor's property located at 23 Jacob Street, Dorchester, Massachusetts and to withdraw its motion for leave to appeal. The parties also agreed that the Debtor would execute and deliver to Rhodes a mortgage in the amount of $45,000.00 for recordation and that they would establish an escrow account for net proceeds from the Debtor's refinancing with US Trust, which was anticipated at the time the stipulation was executed.

Rhodes failed to answer the Debtor's adversary complaint. It filed a voluntary petition under Chapter 7 on April 7, 1994, and Stephen Gray ("Gray") was appointed Chapter 7 Trustee. On July 20, 1994, the Debtor moved for relief from the automatic stay in the Rhodes case to continue the prosecution of his adversary proceeding. Rhodes' Chapter 7 Trustee assented to the motion. On August 11, 1994, Gray filed an answer to the Plaintiff's complaint.

On September 7, 1994, the Debtor moved for partial summary judgment against the Rhodes Chapter 7 estate under the federal Truth in Lending Act, 15 U.S.C.A. §§ 1601–1667e (West 1982 & Supp.1994) ("TILA"), and the Massachusetts Consumer Credit Cost Disclosure Act, Mass.Gen.Laws Ann. Ch. 140D, §§ 1–34 (West 1991 & Supp.1994) ("CCCDA"), arguing that the following charges which Rhodes required the Debtor to pay were conditions of closing the loan and were undisclosed finance charges as defined by TILA and CCCDA:

1. a $2,954.00 brokerage commission to The Money Tree, Inc., a mortgage broker that shared Rhodes' address and was managed by the brother of Rhodes' president and sole shareholder;

2. a $25.00 fee to purchase an amortization schedule for a non-amortizing loan;

3. a $10.00 fee to record an assignment of the mortgage to a third party;

4. a $50.00 fee for updating the title even though Rhodes charged a $250 fee for a full title examination;

5. a portion of the above $50.00 fee to record documents even though Rhodes separately imposed itemized fees which fully covered its recording costs.

Gray, on behalf of the Rhodes estate, responded to the motion for partial summary judgment, disputing that the five charges outlined by the Debtor were undisclosed finance charges. The Trustee relied in part on the affidavit of Cheryl White, Rhodes's president and sole shareholder, which affidavit was filed in conjunction with Rhodes's opposition to the Debtor's request for a preliminary injunction.

On November 7, 1994, the Court heard the motion for partial summary judgment, as well as the Plaintiff's motion to strike certain portions of the affidavit of Cheryl White. During the course of the hearing, the Court granted the Plaintiff's motion to strike the portion of White's affidavit in which she stated that Rhodes never required the use of The Money Tree or any other broker in connection with making loans and that Rhodes did not require the Debtor to use The Money Tree as a broker. The Court found the following arguments made by the Debtor to be meritorious: 1) that the November 6, 1990 letter from Ms. White to Mr. Whitley, in which Ms. White outlined the "highlights" of the loan, including a broker's fee of approximately $3,000.00, and legal fees of approximately $1,500.00, constituted an offer that was accepted by the Debtor; 2) that the "highlights" set forth in the offer were in fact conditions for making the loan; and 3) that as a result of the parol evidence rule the affidavit could not be used to contradict the terms of the contract that resulted from the Debtor's acceptance of Rhodes's offer.

As a result of the Court's ruling, Gray's counsel conceded that a violation of TILA (and concomitantly CCCDA) had occurred, and the focus of the hearing shifted to the remedies available to the Debtor. At the conclusion of the hearing, the Court granted the Plaintiff leave to amend his complaint to

detail actual damage claims and ordered the parties to file supplemental memoranda of law.

## II. FACTS

The following facts are undisputed. The Debtor has resided at 23 Jacob Street, Dorchester, Massachusetts with his family of six for the past 16 years. In the fall of 1990, he responded to an advertisement and applied to The Money Tree for a second mortgage on his home. The Money Tree submitted his application to Rhodes and, on November 6, 1990, Ms. White, on behalf of Rhodes, wrote to the Debtor, stating the following:

> We have tentatively approved your loan; however, it is important you understand certain terms and conditions that will apply, and may influence your decision in accepting our loan....

The following are the highlights of your loan:

1. Gross amount of loan: $32,000.00.

2. Term of loan: 2 years, interest only.

3. Interest rate: Initial rate 16% per annum, then adjustable periodically to prime rate plus 10% per annum, not less than 18% per annum.

4. Origination fee to Rhodes (1%): $320.00.

5. Buydown (non-refundable): $3,000.00.

6. Broker fee (to The Money Tree): $3,000.00.

7. Legal fees (approximately): $1,500.00.

8. Resulting A.P.R. (as prepared): 27%.

The Debtor did not sign any loan brokerage or commission agreement with The Money Tree at any time prior to the loan closing, which took place on November 29, 1990. On that date, Rhodes, a creditor as defined in 15 U.S.C. § 1602(f) and M.G.L. c. 140D, § 1, loaned the Debtor $31,000.00, secured by a second mortgage on his Dorchester home.

At the closing, the Debtor signed documents entitled "Disclosure Statement" and "Loan Accounting and Disbursement Authorization." The Disclosure Statement set forth, among other things, an annual percentage rate of 26.25759%, a finance charge of $15,710.69, an amount financed of $27,543.77, and a total of payments of $43,254.46. The Loan Accounting and Disbursement Authorization set forth the following:

```
RECEIPTS:
Rhodes Financial Services, Inc.
 –Initial Disbursement                                          $31,000.00
PROJECTED APPLICATION AND DISBURSEMENT OF LOAN PROCEEDS:
LOAN ORIGINATION FEE
 TO: Rhodes Financial Services, Inc.                                310.00
ODD DAYS INTEREST
 TO: Rhodes Financial Services, Inc.                                165.23
ATTORNEY'S FEE
 TO: Stuart H. Sojcher, Esq.                                      1,040.00
FULL TITLE EXAMINATION
 TO: Alan H. Rosenbaum, Esq.                                        250.00
UPDATING OF TITLE; RECORDING OF DOCUMENTS
 TO: Alan H. Rosenbaum, Esq.                                         50.00
CONTRACT INTEREST RATE BUYDOWN (NON–REFUNDABLE)
 TO: Rhodes Financial Services, Inc.                              2,981.00
DOCUMENT PREPARATION
 TO: Stuart H. Sojcher, Esq.                                        195.00
APPRAISAL FEE
 TO: ($250.00 P.O.C.)                                                  N/A
MUNICIPAL LIEN CERTIFICATE                                           25.00
RECORDING FEES
     –Mortgage                                                       25.00
     –Assignment of Mortgage                                         10.00
     –Discharge of Mortgage and Liens                                 N/A
FINANCIAL CONSULTANT
 TO: The Money Tree, Inc.                                         2,954.00
TITLE INSURANCE (Lenders and Borrowers)
```

| | |
|---|---|
| TO: Lawyers Title Insurance Company | 150.00 |
| AMORTIZATION SCHEDULES | |
| TO: Stuart H. Sojcher, Esq. | 25.00 |
| COURIER/HANDLING FEES: | 30.00 |
| WATER/SEWER TAXES | |
| TO: City of Boston | 3,813.16 |
| REAL ESTATE TAXES | |
| TO: | N/A |
| HOMEOWNER'S INSURANCE | |
| TO: MacIntyre, Fay & Thayer | 452.00 |
| PAYOFF SECOND MORTGAGE | |
| TO: 1st American (FDIC) | 7,000.00 |
| PAYOFF | |
| TO: U.S. Trust (Windows) | 4,599.29 |
| PAYOFF | |
| TO: Boston Edison | 981.29 |
| PAYOFF | |
| TO: Boston Gas | 564.18 |
| CHECK(S) TO BORROWER(S) | |
| TO: Earle K. Whitley | 5,379.85 |
| TOTAL DISBURSEMENTS | $31,000.00 |

On November 30, 1990, Rhodes recorded its mortgage on the Debtor's home. On December 27, 1990, Rhodes assigned its mortgage to Randal Mortgage Corp.

In mid-summer of 1992, with the two year balloon payment coming due, the Plaintiff approached Rhodes seeking to convert the short-term loan to a long-term loan. Rhodes informed the Debtor that it would not make such a loan even though he had regularly made all his payments.

On January 22, 1993, the Debtor, through his counsel, in a letter addressed to "Rhodes Financial, Inc." at the correct address in Natick, Massachusetts, informed Rhodes that he wished to rescind the loan.[1] On February 11, 1993, Rhodes replied to the letter, through counsel, stating "although we are substantively responding to your January 22, 1993 letter, we do not concede that it is proper notification under Massachusetts General laws, Chapter 140D.

In May of 1993, the Plaintiff was selected in a lottery held by US Trust as a prospective recipient of refinancing monies to be used to save his home. On August 12, 1993, US Trust issued a loan commitment to the Plaintiff for $45,000.00, a sum sufficient to pay off the first mortgage and the principal amount of Rhodes's second mortgage. The loan closing was scheduled to take place on October 20, 1993. The closing did not take place, however, because Rhodes demanded $41,965.91, as well as a release of the Plaintiff's claims against Rhodes. Thereafter, Rhodes took steps to foreclose its mortgage. The Debtor filed a voluntary petition under Chapter 13 of the Bankruptcy Code on October 27, 1993 to forestall a foreclosure sale.

### III. SUMMARY JUDGMENT STANDARDS

The Debtor is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed. R.Civ.P. 56(c), made applicable to this proceeding by Fed.R.Bankr.P. 7056.

### IV. STATUTORY PROVISIONS

■ Section 1635 of TILA provides in relevant part the following:

---

1. Although the letter was addressed to Rhodes Financial, Inc., counsel in the first sentence of his letter, represented that he was representing "a Rhodes Financial Services, Inc. mortgagor."

(a) Except as otherwise provided in this section, in the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so....

\*   \*   \*   \*   \*   \*

(b) When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by the court....

\*   \*   \*   \*   \*   \*

(f) An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first....

\*   \*   \*   \*   \*   \*

(g) In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.

15 U.S.C. § 1635. Section 1640 provides in relevant part the following:

(a) Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—

(1) any actual damage sustained by such person as a result of the failure;

(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, ... except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000 ...; and

(3) in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court.

\*   \*   \*   \*   \*   \*

(e) Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation....

15 U.S.C. § 1640. CCCDA provisions parallel those of TILA, and, accordingly, "should be construed in accordance with federal law." *Mayo v. Key Financial Services, Inc.*, No. 92–6441–D, slip op. at 6–7 (Superior Court June 22, 1994). Moreover, the regulations promulgated under TILA and CCCDA are

substantially similar as well. The only differences are with respect to the statutes of limitation for rescission and damage claims. Under the CCCDA, an obligor has four years to rescind and four years, rather than one year, to institute an action for damages. *Compare* M.G.L. c. 140D, §§ 10, 32 *with* 15 U.S.C. §§ 1635(f), 1640(e). As United States Bankruptcy Judge Hillman noted in *Myers v. Federal Home Loan Mortgage Co. (In re Myers)*, 175 B.R. 122, 125 (Bankr.D.Mass. 1994), the Federal Reserve Board has determined that " '[c]redit transactions subject to the Massachusetts Truth in Lending Act are exempt from chapters 2 and 4 of the Federal act' ", except with respect to certain creditors that are federally chartered institutions. *See* 48 Fed.Reg. 14882, 14890 (April 6, 1983). Accordingly, for purposes of resolving the instant dispute, the only material difference between state and federal law is the limitation period for rescission and damages claims. Since the Debtor filed his adversary proceeding within four years of the November 29, 1990 loan closing, his rescission and damage claims are timely under Massachusetts law.

## V. DISCUSSION

### A. THE TILA AND CCCDA VIOLATIONS

■ The Debtor maintains that Rhodes required him to pay a brokerage commission to The Money Tree as a term and condition of the loan and Rhodes's failure to disclose this fee as a finance charge violated TILA and CCCDA. Regulation Z, a regulation issued by the Board of Governors of the Federal Reserve System to implement the Truth in Lending Act, defines the term finance charge as " . . . the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4(a). The Official Staff Commentary to Regulation Z promulgated by the Board further provides that "[c]harges imposed on the consumer by someone other than the creditor for services not required by the creditor are not finance charges, as long as the creditor does not retain the charges."

Regulation Z, Supplement I–Official Staff Interpretations, 12 C.F.R. § 226.4(a)(3) (1991). Moreover, charges which are bona fide and reasonable in amount may be excluded if they relate to any one of the following:

(i) Fees for title examination, abstract of title, title insurance, property survey, and similar purposes.

(ii) Fees for preparing deeds, mortgages, and reconveyance, settlement, and similar documents.

(iii) Notary, appraisal, and credit report fees.

(iv) Amounts required to be paid into escrow or trustee accounts if the amounts would not otherwise be included in the finance charge.

Regulation Z, 12 C.F.R. § 226.4(c)(7).

According to the Debtor, since brokers' fees are not contained in any of the exclusions of Regulation Z with respect to finance charges, they constitute a finance charge. The Trustee argues that Rhodes did not require the Debtor to use the services of The Money Tree, relying upon the affidavit of Ms. White. Since the Court determined on November 7, 1994 that Rhodes cannot rely upon that affidavit as a result of the parol evidence rule, *see Thomas V. Christensen*, 12 Mass. App.Ct. 169, 176, 422 N.E.2d 472 (1981); *Trustees of Tufts College v. Parlane Sportsware Co., Inc.*, 4 Mass.App.Ct. 783, 342 N.E.2d 727 (1976); *see also Baker v. Rapport*, 453 F.2d 1141 (1st Cir.1972); *Wier v. Texas Co.*, 79 F.Supp. 299 (W.D.La.1948), *aff'd*, 180 F.2d 465 (1950), the Court finds that Rhodes required the services of The Money Tree and $2,954.00 should have been disclosed as part of the finance charge.

■ Rhodes also required the services of attorneys. Attorneys' fees for preparing deeds, mortgages, settlement sheets and similar documents are excluded from the finance charge. Likewise, fees for title examinations are excluded. However, these fees must be "bona fide and reasonable in amount." Regulation Z, 12 C.F.R. § 226.4(c)(7). The Court finds that the $25.00 charge for the preparation of an amortization schedule for a non-amortizing loan was an unreasonable, in-

deed an egregious, fee that should have been included in the finance charge.

■ The $10.00 recordation fee for Rhodes's assignment of the mortgage to Randal Mortgage Corporation is not a charge that can be excluded from the finance charge as it pertained to a separate transaction that did not involve the Debtor. Regulation Z provides in relevant part that "[t]he finance charge includes ... [c]harges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay the charges in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation." *See* 12 C.F.R. § 226.4(b)(6). Pursuant to the plain language of the state and federal regulations, the future assignment fee was not excludable from the finance charge and resulted in the finance charge being understated. *See Mayo v. Key Financial Services, Inc.,* No. 92–6441–D, slip op. at 6–7 (Superior Court June 22, 1994), *citing In re Brown,* 106 B.R. 852, 858–59 (Bankr.E.D.Pa.1989); *Cheshire Mortgage Service, Inc. v. Montes,* 223 Conn. 80, 100–01, 612 A.2d 1130 (1992).

■ The Debtor objects to the $50.00 lump sum charge for updating the title and recording documents, citing the Commentary to Regulation Z, which provides: "If a lump sum is charged for several services and includes a charge that is not excludable from the finance charge under Regulation Z, § 226.4(c)(7), a portion of the total should be allocated to that service and included in the finance charge." The Debtor maintains that a charge for updating the title is unreasonable because he was also charged $250.00 for a "full" title examination and any portion of the same $50.00 charge relating to recording documents cannot be excluded from the finance charge because Rhodes separately charged for all compensable recording fees.

The Trustee responds with the observation that the $50.00 lump sum charge related to attorney's fees for a title update, which he maintains was prudent in view of the Debtor's financial history, and to time actually spent transporting documents to the Registry for recordation. From the existing record, the Court is unable to determine whether a portion of the $50.00 was spent on actual recording fees, in which case that portion would be part of the finance charge, as only the second mortgage itself was recorded for a $25.00 fee, or whether all of or only a portion of the charge was for attorney's fees. The Court also has no evidence as to what customary and reasonable attorney's fees were in 1990 with respect to full title examinations and whether there was anything unusual or complicated about the state of the Debtor's title that would warrant additional attorney time. Accordingly, based upon the existing record, the Court cannot find that this $50.00 charge was an undisclosed finance charge and that a material misrepresentation of the finance charge occurred because of Rhodes's treatment of this charge.

In view of the foregoing discussion, the Court grants the Debtor's Motion for Partial Summary Judgment in so far as it seeks a determination that $2,989.00 of the sums disbursed at the closing constituted undisclosed finance charges.

### B. RIGHT TO RESCIND AND DAMAGES

#### 1. The Amended Complaint

■ In his Amended Complaint, the Debtor seeks the following forms of relief: 1) a declaration that the Plaintiff validly rescinded the transaction, that the Defendant's security interest is void and the Defendant's secured claim is disallowed; 2) a declaration that the Defendant's failure to honor the Plaintiff's valid rescission notice in accordance with the dictates of 15 U.S.C. § 1635 and M.G.L. c. 140D, § 10 vests in the Plaintiff the right to retain the net loan proceeds and that the Defendant has no allowable unsecured claim; 3) an order requiring the discharge of the second mortgage; 4) an order requiring the Defendant to refund to the Plaintiff all money paid to the Defendant in connection with the transaction; 5) an award of $1,000.00 in statutory damages for the Defendant's failure to comply with 15 U.S.C. § 1638 and M.G.L. c. 140D, § 12, and an award of an additional $1,000.00 in statutory damages for the Defendant's failure to comply with 15 U.S.C. § 1635(b) and M.G.L.

**150**

c. 140D, § 10(b); 6) actual damages; and 7) reasonable attorney's fees and costs.

### 2. Positions of the Parties

#### a. The Debtor

The Debtor relies upon the plain language of Regulation Z, which sets forth the effects of rescission as follows:

(1) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

(2) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

(3) If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph (d)(2) of this section. When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value.... Tender of money must be made at the creditor's designated place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.

(4) The procedures outlined in paragraphs (d)(2) and (3) of this section may be modified by court order.

Regulation Z, 12 C.F.R. § 226.23(d)(1)–(4). *See also* 15 U.S.C. § 1635(b) and M.G.L. c. 140D, § 10(b).

The Debtor, relying upon *Myers v. Federal Home Loan Mortgage Co. (In re Myers)*, 175 B.R. 122 (Bankr.D.Mass.1994), and cases cited therein, argues that Rhodes's security interest was void upon receipt of the rescission notice, and this effect of rescission can-

not be conditioned or modified by the Court. Accordingly, the Debtor argues that, at best, Rhodes's Chapter 7 estate has an unsecured claim against the Debtor's estate. Additionally, he argues that pursuant to either section 1635(b) of TILA or section 10(b) of CCCDA and the applicable state and federal regulations, Rhodes forfeited its right to the return of any of the loan proceeds. In other words, the Debtor maintains 1) that he had no obligation to tender because Rhodes, after receipt of the notice of rescission, failed to return to him "any money or property given as earnest money or down payment;" and 2) that he did indeed "tender" $31,000.00 to Rhodes, which tender was refused.

The Debtor also argues that this Court should use its modification powers to vest the loan proceeds in him, even if the Court were to rule that the proceeds of the Rhodes loan have not explicitly vested in him due to Rhodes' failure to accept tender (or, as this Court observes, because the Debtor did not actually tender the proceeds to Rhodes at its usual place of business in conformance with Regulation Z). The Debtor emphasizes Rhodes's predatory lending practices set forth in the amicus brief filed by the Commonwealth.

Finally, the Debtor seeks the full panoply of damages available to him under TILA and CCCDA.[2] In particular, the Debtor seeks actual damages consisting of an unspecified amount of interest that he was compelled to pay US Trust on the additional funds he was forced to borrow and place into escrow because of Rhodes' actions and undisclosed finance charges which this Court has determined to be $2,989.00. He also seeks a second statutory damage award in the amount of $1,000.00, citing *Aquino v. Public Finance Consumer Discount Co.*, 606 F.Supp. 504 (E.D.Pa.1985), as well as unspecified costs and attorney's fees. *See also In re Michel*, 140 B.R. 92, 101 (Bankr.E.D.Pa. 1992) ($1,000.00 awarded to debtors for lender's refusal to honor valid rescission, plus reasonable attorney's fees pursuant to 15 U.S.C. § 1640(a)(3)).

**2.** As the court recognized in *Myers,* 175 B.R. at 127, unlike TILA, the CCCDA does not have a one year statute of limitations for damage claims.

### b. Chapter 7 Trustee of the Rhodes Estate

The Trustee's position is succinctly stated in his memorandum as follows:

In this case, the equities clearly favor allowing the Trustee to maintain at least an unsecured claim against the Plaintiff's Estate. This is not a proper case to force compliance with TILA's requirements or provide an incentive for a creditor to comply with TILA. In this case, Rhodes has already filed bankruptcy, thus, any of the remedial and punitive policies of TILA will have no impact on Rhode's [sic] future lending policies. Rather, the harsh remedies will only harm other creditors of Rhodes. If this Court is to allow rescission, it should condition the rescission on the Plaintiff returning all proceeds he received from the loan to the Trustee or, alternatively, allowing the Trustee an unsecured claim against the Plaintiff's Estate.

Supplemental Memorandum in Support of Trustee's Opposition to Plaintiff's Motion for Partial Summary Judgment. The Trustee's position is not without support. *See, e.g., Williams v. Homestake Mortgage Co.,* 968 F.2d 1137 (11th Cir.1992); *Brown v. Nat'l Permanent Fed. Sav. & Loan Ass'n,* 683 F.2d 444 (D.C.Cir.1982); *Powers v. Sims and Levin,* 542 F.2d 1216 (4th Cir.1976); *New Maine Nat'l Bank v. Gendron,* 780 F.Supp. 52 (D.Me.1991); *In re Lynch,* 170 B.R. 26 (Bankr.D.N.H.1994); *In re Cox,* 162 B.R. 191 (Bankr.C.D.Ill.1993); *In re Foster,* 105 B.R. 67 (Bankr.N.D.Okla.1989).

### C. ANALYSIS

In *Homestake,* a case relied upon by the New Hampshire Bankruptcy Court in *Lynch,* the Court of Appeals for the Eleventh Circuit considered 15 U.S.C. § 1635(b) and 12 C.F.R. § 226.23(d)(1)–(4), while recognizing that "[t]he sequence of rescission and tender set forth in § 1635(b) is a reordering of common law rules governing rescission. It noted the following:

Under common law rescission, the rescinding party must first tender the property that he has received under the agreement before the contract may be considered void. Once the rescinding party has performed his obligations, the contract becomes void and the rescinding party may then bring an action in replevin or assumpsit to insure that the non-rescinding party will restore him to the position that he was in prior to entering into the agreement, i.e., return earnest money or monthly payments and void all security interests. Under § 1635(b), however, all that the consumer need do is notify the creditor of his intent to rescind. The agreement is then automatically rescinded and the creditor must, ordinarily, tender first. Thus, rescission under § 1635 'place[s] the consumer in a much stronger bargaining position than he enjoys under the traditional rules of rescission.' Furthermore, because rescission is such a painless remedy under the statute [placing all burdens on the creditor], it acts as an important enforcement tool, insuring creditor compliance with TILA's disclosure requirements.

Though one goal of the statutory rescission process is to place the consumer in a much stronger bargaining position, another goal of § 1635(b) is to return the parties most nearly to the position they held prior to entering into the transaction. The addition of the last sentence of § 1635(b), stating that '[t]he procedures prescribed by this subsection shall apply except when otherwise ordered by the court,' was added by the Truth in Lending Simplification and Reform Act ... and is a reflection of this equitable goal.

*Id.* The court, while citing *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980), then considered and rejected the obligor's argument that the Federal Reserve Board Staff Interpretations construing TILA and Regulation Z should be dispositive. It stated the following:

[The obligor] reads this section of the regulations to mean that 'the court modification provision in subsection (d)(4) applies only to subsections (d)(2) and (d)(3) and does not apply to the first step of the rescission process, given in subsection (d)(1).... Thus, according to Williams [the obligor], the voiding of the creditor's

security interest, which Williams argues is guaranteed by the mandate of subsection (d)(1), may not be conditioned on the consumer's tender. Although this is technically correct, it is not a realistic recognition of the full scope of the statutory scheme....

\* \* \* \* \* \*

Where 'the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.' In this instance, Congress, through its legislative history, has made it quite clear that 'the courts, at any time during the rescission process, may impose equitable conditions to insure that the consumer meets his obligations after the creditor has performed his obligations as required by the act.' Furthermore, the plain language of § 1635(b) leaves little room for narrowing the court's ability to modify the process of effecting rescission, as Congress' grant of authority covers all 'procedures prescribed by [the] subsection.' Thus, we hold that a court may impose conditions that run with the voiding of a creditor's security interest upon terms that would be equitable and just to the parties in view of all surrounding circumstances.

*Id.* 968 F.2d at 1141–42 (citations omitted, footnote omitted). Thus, the Court of Appeals for the Eleventh Circuit concluded that TILA as amended gives courts the authority to restructure loans in ways that could range from ordering the immediate return of the full principal to leaving the creditor with its state law rights to requiring the execution of substitute security instruments based upon such considerations as the severity of the TILA violations and the creditor's ability to repay. *Id.* at 1142 n. 9.

The legislative history of TILA indicates that "a court is authorized to modify this section's [section 1635(b) ] *procedures* where appropriate", *see* S.Rep. No. 96–368, 96th Cong., 2nd Sess. 29 (1979), reprinted in 1980

U.S.Code Cong. & Ad.News 236, 264–65 (emphasis supplied). Regulation Z, which regulation the United States Supreme Court has determined to be dispositive unless "demonstrably irrational," *Milhollin,* 444 U.S. at 556, 100 S.Ct. at 792, was effective in April of 1981 and amended in March of 1982, *after* the enactment of the Truth in Lending Simplification and Reform Act. It breaks down the provisions of section 1635(b) into four parts, only two of which are subject to the discretion of courts. Courts following the reasoning of *Homestake* reject the import of Regulation Z to the extent that it purports to limit the discretion courts have to condition or modify the effect of a customer's notice of rescission, namely the voiding of any security interest.

This Court need not decide whether it lacks the ability to condition rescission on a customer's tender because in this case the Court chooses not to condition rescission and to follow the position espoused by the court in *Myers:* "rescission by an obligor is not conditioned by tender or payment in the context of a bankruptcy case." *Myers,* 175 B.R. at 130. *Cf. In re Holland,* No. 93–19496–JNF, slip op., 1994 WL 772758 (Bankr.D.Mass. December 21, 1994).

In *Myers,* Bankruptcy Judge Hillman adopted the reasoning advanced by the district court in *In re Celona,* 98 B.R. 705, 707 (E.D.Pa.1989), a case in which the court stated that " '[j]udicial preconditioning of cancellation of the creditor's lien on the customer's tender is inappropriate in bankruptcy cases.' " This Court can conceive of circumstances where the statutory right to rescind might be conditioned upon an obligor's tender based upon equitable considerations, in which case a determination as to whether the effect of a rescission notice is a substantive right not subject to discretionary action or a procedural step subject to the last sentence of section 1635(b); however, this case is not one of them.[3] As the court stated in *Aquino v. Public Fin. Consumer Discount Co.,* 606 F.Supp. 504 (E.D.Pa.1985), "courts in their

---

**3.** The Court notes and it is undisputed that the Commonwealth of Massachusetts, through the Attorney General, commenced an action against Rhodes, The Money Tree and Randolph Lee White, II, alleging that they engaged in unfair and deceptive lending and brokerage practices and preyed on unsophisticated Massachusetts consumers.

effort to insure a just result should not forget that the TILA 'was passed primarily to aid the unsophisticated consumer'" and that it was "'intended to balance scales thought to be weighted in favor of lenders and ... to be liberally construed in favor of borrowers.'" *Id.* at 509, *citing Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246, 248 (3d Cir.1980), and *Bizier v. Globe Financial Services, Inc.*, 654 F.2d 1, 3 (1st Cir.1981).

The Court finds that the Debtor's notice of rescission was valid (the omission of the words "Services" in the address preceding the salutation was harmless as Rhodes was correctly identified in the first sentence of the rescission letter). Accordingly, upon receipt of the notice, the mortgage was void, and Rhodes's claim became an unsecured claim. *See* Regulation Z, 12 C.F.R. § 226.23(d)(1). Since the rescission notice was transmitted to Rhodes approximately nine months prior to the bankruptcy filing, Rhodes had at best an unsecured claim on the petition date. The Court takes judicial notice that Rhodes was listed as a creditor on the Debtor's schedules and matrix and received notice of the section 341 meeting of creditors, as well as the March 21, 1994 deadline for filing proofs of claim. Rhodes did not file a proof of claim. Accordingly, the Trustee's unsecured claim against the Debtor is disallowed pursuant to 11 U.S.C. § 502. *See also* Fed.R.Bankr.P. 3002(c).

## VI. CONCLUSION

■ In accordance with the foregoing, the Court grants the Debtor's Motion for Partial Summary Judgment. The Court finds that the Debtor shall have an unsecured claim against the Rhodes estate comprised of the following: 1) statutory damages in the amount of $2,000.00, *see* M.G.L. c. 140D, § 32(a)(2)(a) ($1,000.00 for material nondisclosures and $1,000.00 for failure to honor the valid rescission notice); and 2) actual

damages in the amount of costs equal to the amount of interest paid on the sum borrowed from US Trust and costs and reasonable attorney's fees incurred in conjunction with the TILA and CCCDA violations, *Id.* § 32(a)(3). The Court also finds that the Debtor is entitled to an unsecured claim against the Rhodes's estate equal to the amount of money he paid during the two years the loan was in good standing, an amount he estimates at approximately $18,-000.[4]

The Court hereby orders the Debtor and his attorney to file the following within 20 days of the date of this order: 1) a statement indicating the precise amount of payments made by the Debtor to Rhodes prior to the filing of his Chapter 13 petition; 2) a statement as to the interest paid by the Debtor on account of monies borrowed from US Trust; and 3) a fee application in conformance with Local Rule 34.

---

4. Rhodes's Trustee would at most have an unsecured claim against the Debtor's estate in the amount of $22,789.77, representing the proceeds which the Debtor had at his disposal following the closing ($5,379.85) plus the total amount of proceeds used to procure insurance and to satisfy outstanding obligations owed by the Debtor at the time of the closing. Even assuming Rhodes's Trustee were to obtain an allowed claim against the Debtor's estate, its only effect would be to delimit the Debtor's unsecured claim against the Rhodes estate, since the Debtor's claim against the Rhodes estate likely will exceed any claim the Trustee would have against the Debtor as attorney's fees and costs are likely to exceed $3,000.00.