Christopher **DWYER** and Sandy K. Barlow, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**BARCO AUTO LEASING CORP.,** Barron Chevrolet, Inc., and Bernardi, Inc., Defendants.

Civ. A. No. 95–10888–WGY.

United States District Court, D. Massachusetts.

Oct. 5, 1995.

---

Michelle Ann Weinberg, Daniel A. Edelman, Edelman & Combs, Chicago, IL, John Roddy, Grant & Roddy, Boston, MA, for Christopher Dwyer.

Robert H. Gaynor, Sloane & Walsh, Boston, MA, W. Paul Needham, Kevin M. Hensley, Needham & Warren, Boston, MA, for Barco Auto Leasing Corp.

Robert G. Eaton, Robert H. Gaynor, Sloane & Walsh, Boston, MA, for Barron Chevrolet Inc.

Gary S. Matsko, Davis, Malm & D'Agostine, P.C., Boston, MA, for Bernardi, Inc.

Michelle Ann Weinberg, Edelman & Combs, Chicago, IL, John Roddy, Grant & Roddy, Boston, MA, for Sandy K. Barlow.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

In this putative class action, lessees of motor vehicles challenge the business practices of a financing company, Barco Auto Leasing Corp. ("Barco" or the "financer"), and two dealerships, Barron Chevrolet, Inc. ("Barron") and Bernardi, Inc. ("Bernardi") (collectively, the "dealers" or the "dealerships"). The plaintiffs allege violations of the Consumer Leasing Act of 1976, 15 U.S.C. § 1667a (the "Act"),[1] and the Massachusetts Consumer Protection Act, Mass.Gen.Laws ch. 93A, §§ 2, 9 ("Chapter 93A"), and also assert claims for breach of contract. Each defendant moved for summary judgment on all claims. At a motion hearing on September 13, 1995, the Court denied Barco's motion out of hand save for the issue whether the applicable Massachusetts statute of limitations bars the chapter 93A claims against all defendants. The Court also took under advisement the federal question whether the dealers are "lessors" under, and therefore subject to, the Act.[2] The Court here deals with the federal statutory question first.

---

**1.** Although the parties and some cases refer to the statute as the Truth in Leasing Act, the Congress has designated it the Consumer Leasing Act, and the Court will refer to it as such. Pub.L. No. 94–240, § 1, 90 Stat. 257 (1976).

**2.** The plaintiffs concede that their breach of contract claims against Barron and Bernardi depend

## I. Background

■ For the purpose of resolving the defendants' motions for summary judgment, the Court recounts the evidentiary record properly before it in the manner most favorable to the plaintiffs. *Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.*, 972 F.2d 426, 429 (1st Cir.1992). In the spring of 1989, the plaintiff Christopher Dwyer ("Dwyer") went to Barron to lease a 1989 Chevrolet Fleetside pickup, ultimately entering into a lease agreement with Barco. According to Dwyer, the lease was arranged by, and signed on the premises of, Barron. Similarly, in the summer of 1990, plaintiff Sandy K. Barlow ("Barlow") entered into a lease agreement with Barco for a 1990 Honda Accord EX sedan. Barlow claims the lease was arranged by, and signed on the premises of, Bernardi.

Dwyer and Barlow both claim to have leased their vehicles primarily for personal, family, or household use, and not for business or commercial purposes. Barlow avers that the Bernardi salesperson with whom she dealt asked her whether she planned to use the car for personal or business use, and that she responded that she would use it "entirely for personal and family purposes," and never for business.

The defendants have produced documents, however, signed by Dwyer and Barlow, which state in their entirety:

> Please be advised that Barco Auto Leasing Corp. is relying upon your representation that the vehicle you are leasing from us ... is *primarily* for business or commercial, as opposed to personal, household, or family purposes.

Affidavit of Stephen Baron, Exhs. 1, 2 (emphasis in original). Dwyer and Barlow do not recall seeing or signing such documents, admit that they did not carefully read the documents presented to them for signature at the lease closings, and were not given copies of the business-use statements along with copies of all other documents necessary to the transactions.

In the spring of 1995, Barlow sought to terminate her lease prior to its expiration, and returned the Honda to Barco by delivering it to Bernardi. As a result, Barco sent her a bill for $1,768.36, which Barlow characterizes as a penalty for early termination of the lease.[3]

## II. The Consumer Leasing Act

### A. Background

Bernardi and Barron assert that the Act does not apply to them because they neither entered into lease agreements with the plaintiffs nor "arranged" for such leases. *See* 15 U.S.C.A. § 1667(3) (West 1982) (defining lessor to include one who regularly "arrang[es] to lease under a consumer lease"). Dwyer and Barlow admit that they did not enter into leases with the dealers, but argue strenuously that they are liable as arrangers. To determine the status of Barron and Bernardi and the applicability of the Act's disclosure requirements to them, the Court must examine the events surrounding, and the dealerships' role in, the execution of the leases.

What emerges most strikingly from the materials before the Court is the fact that the parties entertained radically different perceptions of the essential nature of the transactions into which they had entered. To Barron and Bernardi, two separate and

---

entirely on those defendants' status as lessors, and thus rise or fall with the claims under the Act.

**3.** According to a letter sent by Robert Guisti, Barco's Collection Manager, Barco computed Barlow's "arrears" at the time of termination as follows: $499.98 for Monthly Billing; $693.38 for Mileage; $225 for Damage to Vehicle; and a "Lease Disposition Fee" of $350. It is unclear which, if any, of these charges were assessed as a penalty for early termination, as they all appear to arise from the fact, and not the timing, of termination. Section 8 of the lease states: "At the termination of the lease you will pay to us any unpaid total periodic payments, any unpaid late charges, a disposition charge of $350.00 [and] any excess mileage charges for which you may be responsible ..." Section 12 further states: "In any event, where ... the vehicle is returned with damage to the interior or exterior you will bear the cost of restoring the vehicle to its original condition." There is no provision in the lease regarding the assessment of a penalty for early termination by the lessee; instead, it states flatly, "You have no right to terminate this lease early."

unrelated transactions occurred: they sold the vehicles to Barco and then Barco leased them to Dwyer and Barlow. The dealerships thus draw precise distinctions between themselves and the financer as separate corporate entities engaging in arms-length business dealings. By so doing, the dealers disavow any contractual relationship with the consumers whatsoever. To consumers who walk on the dealership's lot to lease a car or truck, the view is entirely different: the dealer and the financer are, to them, a single entity, or at the very least, two indivisibly related entities working in tandem towards a single goal, with whom they must deal in order to obtain the desired lease. To the extent consumers are even aware of the existence of the financer as a distinct corporate entity, they believe, and the dealer and the financer do little to disabuse them of the notion, that such division is necessary for technical or legal reasons which do not concern them or affect their rights. The legal niceties of the neatly filled out paperwork placed before them by representatives of the dealers, and from which they could discern the "true" nature of the transaction by careful study, simply does not concern the average consumer.

Turning from the general to the specific, Bernardi asserts that it received no fee or other compensation for referring customers to Barco; its personnel had no knowledge of the lease terms, other than the interest rates; and its personnel did not participate in the preparation of the lease documents. Kenneth Mastrangelo, the Bernardi salesman who handled Barlow's transaction, states that Bernardi's practice was to sell vehicles to Barco which then, in turn, leased the vehicle to its customers. He admits that he assisted Barlow in completing the customer credit application, which was then sent by Mastrangelo by telecopier to Barco. Barco approved the application and then drafted and executed all lease documents. Mastrangelo disavows any role in the drafting, negotiation, or execution of any lease documents, and provided no assistance in relation to the drafting of the lease. To like effect are affidavits submitted by Bernardi's Business Manager, Office Manager, and Assistant Office Manager.

Barlow states that when she inquired at Bernardi about leasing a Honda, she dealt with a young man named Ken, presumably Kenneth Mastrangelo. Barlow agreed with Ken that she would lease the car, and Ken introduced her to another person who was to "handle the lease paperwork." This second person, she claims, prepared the lease forms while she waited. Several days later, she returned to Bernardi to sign the lease papers and to pick up the car. She met again with the second man, who had her sign numerous documents, including the lease.

Dwyer tells a similar story. He states that when he went to Barron to lease a pickup truck, he dealt with a salesman named Tim Lawler ("Lawler"). Dwyer ordered the truck, through Lawler, and returned to pick it up. Upon his arrival at the dealership, he found the lease documents prepared and awaiting his signature. Dwyer signed them with Lawler present.[4]

## B. Are the Dealerships "Lessors"?

■ Lessors of certain property to be used primarily for personal, family, or household purposes are required to make disclosures to consumer lessees. 15 U.S.C.A. §§ 1667, 1667a (West 1982). The Act defines a lessor as a "person who is regularly engaged in leasing, offering to lease, or arranging to lease under a consumer lease." Id. § 1667(3). Pursuant to statutory authority, see id. § 1604, the Board of Governors of the Federal Reserve System (the "Board") has promulgated regulations ("Regulation M") to implement the Act. See 12 C.F.R. § 213 (1995). Regulation M explains that to "arrange for lease of personal property" means:

> to provide or offer to provide a lease which is or will be extended by another person under a business or other relationship pursuant to which the person arranging such lease:
>
> > (i) Receives or will receive a fee, compensation, or other consideration for such service; or

4. Barron merely joined in Bernardi's argument at the hearing that the dealers were not lease arrangers, and did not submit evidence regarding the circumstances of Dwyer's lease.

(ii) Has knowledge of the lease terms and participates in the preparation of the contract documents required in connection with the lease.

*Id.* § 213.2(a)(4). The Board's Division of Consumer and Community Affairs issued an "Official Staff Commentary" interpreting Regulation M in 1981. *See* 12 C.F.R. 213, Supp. I–CL–1 (1995); *id.* § 213.1(d). The commentary, which has the force and effect of law, see *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 567–68, 100 S.Ct. 790, 797–98, 63 L.Ed.2d 22 (1980); *Candelaria v. Nissan Motor Acceptance Corp.*, 740 F.Supp. 806, 807 (D.N.M.1990), attempts to provide guidance on the question of who is an arranger of a consumer lease by giving two examples:

An automobile dealer who, pursuant to a business relationship, completes the necessary lease agreement before forwarding it to the leasing company (to whom the obligation is payable on its face) for execution is *arranging* for the lease.

An automobile dealer who, receiving no fee for the service, refers a customer to a leasing company that will prepare all relevant contract documents is not *arranging* for the lease.

12 C.F.R. 213.2(a)(4)(1), Supp. I–CL–1 (1995) (emphasis in original). The commentary also states that "other consideration"

refers to an actual payment corresponding to a fee or similar compensation. It does not refer to intangible benefits, such as the advantage of increased business, that may

flow from the relationship between the parties.

*Id.* § 213.2(a)(4)(3).

The parties have not brought to the Court's attention any case law directly addressing the question of the circumstances under which a dealership may be considered an arranger of a lease, and the Court's own review has failed to uncover any cases which shed more than faint light on the subject.[5]

If the plaintiffs' version of the relevant events is accepted by the factfinder, then Bernardi and Barron "arranged" the leases and are subject to liability under the Act. Each of the disjunctive prongs of Regulation M provides sufficient basis for this decision. *See* 12 C.F.R. § 213.2(a)(4) (1995). First, although the dealers did not receive a separate fee designated as such from Barco in exchange for the so called "referrals" of Barlow and Dwyer, it is reasonable to infer that the price paid by Barco to the dealers reflected or included an amount which may fairly be characterized as a fee or compensation. There is also a genuine issue of material fact as to whether the dealers received "other consideration" for their role in securing customers for Barco. *See id.* § 213.2(a)(4)(i). The plaintiffs are thus entitled to probe further the nature and extent of the relationship between Barco and the dealers.[6]

This decision, despite the defendants' protestations, is compatible with the staff commentary quoted above. The examples given represent the two poles between which most cases will fall. At one end is a

---

**5.** In one case, *Candelaria v. Nissan Motor Acceptance Corp.*, 740 F.Supp. 806 (D.N.M.1990), the court granted summary judgment to the plaintiffs on their Consumer Leasing Act claims against a Nissan dealership and a financing company. In ruling against the dealer, the court stated without amplification that "Melloy Nissan is a motor vehicle dealer ... which regularly arranges for the leasing of consumer property under a consumer lease and is therefore a 'lessor' as defined by Regulation M." *Id.* at 807. While the case stands for the proposition that a dealership may be considered an arranger of a lease in some circumstances, the absence of facts regarding the extent and nature of the relationship between the financer and the dealer prevents the case from offering much guidance to the instant matter.

**6.** The staff commentary of the Board, defining consideration as "an actual payment corresponding to a fee or similar compensation," 12 C.F.R. § 213.2(a)(4)(3), Supp. I–CL–1 (1995), is troublesome. Such a narrow definition renders superfluous Regulation M's inclusion of the phrase "or other consideration" along with "fee" and "compensation" in the definition of "arrange for lease of personal property." *See* 12 C.F.R. § 213.2(a)(4)(i) (1995). Even assuming a strict interpretation of consideration, however, the plaintiffs here are entitled to an opportunity to demonstrate that the dealers received a concrete, identifiable benefit, whether built into the sale price of the car or otherwise, in exchange for generating business for Barco.

dealer who essentially acts as the financer's authorized agent, completing and forwarding the lease agreement for execution. That dealer is an arranger of a lease under the Act. At the other end is a dealer who receives no "fee" and "refers" a customer to the financer that will prepare all the relevant documents. That dealer is not an arranger under the Act. Bernardi and Barron claim to sit squarely at the latter pole, but in reality they occupy the grey zone between the extremes. Their construction of the word "fee" is too narrow, and seems only to encompass the cutting of a check for each customer generated for the financer by the dealers. It is also unclear whether Barron and Bernardi here may fairly be said to have "referred" the plaintiffs to Barco. There is no indication in the record that Barlow and Dwyer had any choice in the selection of financers; they never dealt personally with any Barco representative; and, as noted, the financer and the dealers presented a seemingly unified, monolithic front to customers. At most, the dealers referred the paperwork, and not the customers, to Barco; that is insufficient to fall within the second example given by the commentary.

Regulation M further provides that one who "[h]as knowledge of the lease terms and participates in the preparation of the contract documents" is an arranger. 12 C.F.R. § 213.2(a)(4)(ii) (1995). Mastrangelo, Bernardi's employee, concedes in his affidavit that he assisted Barlow in the preparation of her credit application which became the basis of the lease. Bernardi's further conduct, as averred by Barlow—including "handl[ing] the lease paperwork," preparing what Barlow believed to be "lease forms" in Barlow's presence, and then presenting the documents for Barlow's signature at closing—constitutes participation in the preparation of the contract documents. Bernardi's claim that its employees were unaware of the lease terms, except the rates of interest, appears either disingenuous or willfully ignorant. At the very least, there is a genuine issue of material fact as to whether Bernardi personnel had knowledge of the lease terms, which precludes summary judgment. The same is true of Dwyer and Barron, as Dwyer avers—and Barron makes no attempt to refute—that he

never dealt directly with anyone at Barco and that his salesman, Lawler, orchestrated the preparation and signature of the lease documents.

In short, to accept the defendants' portrait of affairs and hold that Bernardi and Barron are not arrangers would exalt form over substance, defy common sense and experience, and frustrate the broad remedial purposes of the Truth in Lending Act, 15 U.S.C.A. § 1604 et seq. (West 1982 & Supp. 1993), of which the Consumer Leasing Act is an important part. Congress vested considerable power in consumers, creating an army of private attorneys general to enforce its provisions, which were designed "to balance scales thought to be weighed in favor of lenders and [are] thus to be liberally construed in favor of borrowers." *Bizier v. Globe Fin. Servs., Inc.,* 654 F.2d 1, 2–3 (1st Cir.1981); *see also In re Whitley,* 177 B.R. 142, 152–53 (Bankr.D.Mass.1995) (Feeney, J.) ("courts in their effort to insure a just result should not forget that the [Truth in Lending Act] 'was passed primarily to aid the unsophisticated consumer' ") (quoting *Aquino v. Public Fin. Consumer Discount Co.,* 606 F.Supp. 504, 509 [E.D.Pa.1985] ); *Rodash v. AIB Mortgage Co.,* 16 F.3d 1142, 1144 (11th Cir.1994) (Truth in Lending Act to be construed liberally in favor of consumers).

### III. Chapter 93A—Statute of Limitation Issues

Barlow and Dwyer allege in their Third Amended Complaint that the defendants engaged in unfair or deceptive business practices by denoting consumer leases as commercial; by failing to disclose material information as required by the Act and its implementing regulations; by inducing consumers to sign sham commercial use acknowledgments; by failing to disclose the "capitalized cost" of the leased vehicle; and by requiring lessees to waive their rights as consumers under state law. Barlow also alleges that the imposition of fees upon her early termination of the lease constituted an unfair or deceptive act. With the exception of this last item, all the conduct Dwyer and Barlow allege to have violated Chapter 93A occurred more than four years before the institution of this

action. The defendants thus argue that because the plaintiffs were on notice of all the facts giving rise to their Chapter 93A claim in 1989 and 1990, the four-year statute of limitations bars these claims. *See* Mass.Gen. Laws Ann. ch. 260, § 5A (West 1992).

■ The plaintiffs respond that Barlow and all potential class members who were improperly assessed fees within the four-year period state viable Chapter 93A claims. As to the alleged wrongful conduct surrounding the 1989 and 1990 lease executions, the plaintiffs argue that the defendants' deliberate deceit—leading consumers to believe that their leases were not subject to consumer protection laws—equitably tolled the statute of limitations.

As in all questions concerning statutes of limitations, determination of the time of accrual of the cause of action is essential here. Assuming the truth of the plaintiffs' allegations, a cause of action arose under Chapter 93A at the time of lease execution because the defendants' misconduct caused an "invasion of [a] legally protected interest," theoretically entitling the plaintiffs immediately to bring suit and recover at least nominal damages. *See Leardi v. Brown,* 394 Mass. 151, 152, 157–61, 474 N.E.2d 1094 (1985) (tenants suffered "injury" and thus may recover nominal statutory damages where defendant landlord included unfair and deceptive provisions in their leases, despite the tenants' lack of awareness of the provisions and their never having been enforced).

Under *Leardi,* the contention that the defendants' fraudulent and deliberate concealment of the application of consumer protection laws to the lease transactions equitably tolls the statute falls as a matter of its own logic. The plaintiffs build their case, at least in part, on the assertion that they do not remember signing the commercial use statements and that the defendants never gave them copies of the statements. For all Dwyer and Barlow knew, therefore, whatever legal protection existed for the protection of consumers would apply to their transactions, as the cornerstone of their case is that they leased their vehicles primarily for personal, family, or household use. Had the defendants informed Dwyer and Barlow that,

notwithstanding their proposed personal use, the leases were commercial and thus exempt from the Act and Chapter 93A, only then would the plaintiffs' claim of equitable tolling have some force. The defendants' misconduct here (if proven) was designed to provide protection for themselves—a de facto insurance policy—in the event problems arose in the future concerning the leases. Therefore, equitable tolling does not apply and no cause of action may be asserted under Chapter 93A based on misconduct surrounding the execution of leases occurring more than four years before commencement of this action.

■ As to Barlow, however, a different situation obtains. She was assessed fees, see footnote 3 and accompanying text, *supra,* less than a month before the suit was filed. The imposition of such fees pursuant to a lease tainted by fraud, albeit five-year-old fraud, may constitute an unfair or deceptive act subjecting Barco and Bernardi to liability. That cause of action accrued under Chapter 93A at the time Barlow suffered damage in the form of fees, and not at the time of the underlying wrongful acts. *See International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis,* 29 Mass.App.Ct. 215, 220–21, 560 N.E.2d 122 (1990) (accrual of 93A claim occurs "when the plaintiff knew or should have known of appreciable harm" resulting from unfair conduct); *Cambridge Plating Co. v. Napco, Inc.,* 991 F.2d 21, 25 (1st Cir.1993) (accrual of 93A claim "typically occurs at the time injury results from the assertedly unfair or deceptive acts"); *see also* Michael C. Gilleran, *The Law of Chapter 93A* § 10:7, at 341–42 (1989 & Supp.1994). Therefore, the Chapter 93A claims are not time-barred to the extent they are based on actual damages allegedly sustained within the four-year period prior to the filing of the complaint.

## IV. Conclusion

All claims brought pursuant to Chapter 93A arising out of the execution of a lease more than four years before the filing of this action are barred by the statute of limitations of Mass.Gen.Laws ch. 260, § 5A. All 93A claims arising out of the imposition of penalties or fees within the four-year period may

proceed. On the Massachusetts consumer protection claims, therefore, summary judgment is granted against Dwyer, and granted in part and denied in part as to Barlow.

With respect to all other issues taken under advisement, summary judgment is DENIED.